**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

KATHY STUBBS,                    )       CASE NO. 1:17CV2498

                         )

          Plaintiff,      )

                         )

          v.               )       MAGISTRATE JUDGE

                         )       JONATHAN D. GREENBERG

NANCY A. BERRYHILL,      )

      Acting Commissioner    )

      of Social Security,      )       **MEMORANDUM OF OPINION**

                         )       **AND ORDER**

          Defendant.     )

Plaintiff, Kathy Stubbs ("Plaintiff" or "Stubbs"), challenges the final decision of

Defendant, Nancy A. Berryhill,[1] Acting Commissioner of Social Security ("Commissioner"),

denying her applications for a Period of Disability ("POD"), Disability Insurance Benefits

("DIB"), and Supplemental Security Income ("SSI") under Titles II and XVI of the Social

Security Act, 42 U.S.C. §§ 416(i), 423, and 1381 *et seq.* ("Act").  This Court has jurisdiction

pursuant to 42 U.S.C. § 405(g) and the consent of the parties, pursuant to 28 U.S.C. § 636(c)(2).

For the reasons set forth below, the Commissioner's final decision is VACATED and the case

REMANDED for further proceedings consistent with this decision.

## I.  PROCEDURAL HISTORY

In April and May 2015, Stubbs filed applications for POD, DIB, and SSI, alleging a

disability onset date of March 2, 2015 and claiming she was disabled due to "back injury, back

---

[1] On January 23, 2017, Nancy A. Berryhill became the Acting Commissioner of Social
Security.

pain, and knee pain." (Transcript ("Tr.") at 12, 167-174, 216.) The applications were denied initially and upon reconsideration, and Stubbs requested a hearing before an administrative law judge ("ALJ"). (Tr. 12, 107-137.)

On October 19, 2016, an ALJ held a hearing, during which Stubbs, represented by counsel, and an impartial vocational expert ("VE") testified. (Tr. 24-71.) On January 13, 2017, the ALJ issued a written decision finding Plaintiff was not disabled. (Tr. 12-19.) The ALJ' s decision became final on October 5, 2017, when the Appeals Council declined further review. (Tr. 1-6.)

On November 29, 2017, Stubbs filed her Complaint to challenge the Commissioner's final decision. (Doc. No. 1.) The parties have completed briefing in this case. (Doc. Nos. 15, 16, 17.) Stubbs asserts the following assignments of error:

(1)     The ALJ failed to properly evaluate the medical evidence.

(2)     The ALJ did not properly evaluate Stubbs' credibility.

(3)     The ALJ improperly found that Stubbs could return to her past job as a short order cook and machine operator/production worker.

(Doc. No. 15.)

## II.     EVIDENCE

### A.     Personal and Vocational Evidence

Stubbs was born in April 1963 and was fifty-three (53) years-old at the time of her administrative hearing, making her a "person closely approaching advanced age," under social security regulations. (Tr. 18.) *See* 20 C.F.R. §§ 404.1563(d) & 416.963(d). She has at least a high school education and is able to communicate in English. (*Id.*) She has past relevant work as a cook (typically performed as medium but actually performed as heavy, SVP 2); short order

2

cook (typically and actually performed as light, SVP 3); home health attendant (typically and actually performed as medium, SVP 3); mail handler (typically and actually performed as heavy, SVP 3); machine operator/production worker (typically and actually performed as medium, SVP 3); packager (typically performed as medium but actually performed as light, SVP 2); and delicatessen clerk (typically and actually performed as medium, SVP 2). (Tr. 17-18.)

**B.      Relevant Medical Evidence[2]**

*Pre-Onset Date Records*

The record reflects Stubbs was involved in an accident in 2009 "where she fell onto her knees while on an RTA bus." (Tr. 331.) Stubbs reported she subsequently developed swelling in her knees and was told she had ankle arthritis. (*Id.*) She was then in "stable health" until May 12, 2011 when she was again injured while taking public transportation. (*Id.*) Stubbs stated that a door closed on both of her legs, resulting in bruising in her knee area. (*Id.*) Several days later, she presented to the emergency room ("ER") where x-rays revealed a ligament tear. (*Id.*) Stubbs reported she then saw an orthopedist who "told her that she only had arthritis." (*Id.*)

On July 5, 2011, Stubbs presented to neurologist Harold Mars, M.D., with complaints of persistent bilateral knee pain, ankle pain, and mild leg weakness. (Tr. 331-333.) Physical examination findings were normal, including normal strength, sensation, and reflexes. (*Id.*) Dr. Mars found no neurologic deficit but did note Stubbs "constantly rubbed her hands against her knees." (Tr. 333.)

---

[2] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.

3

On January 9, 2013, Stubbs underwent an EMG of her bilateral legs, which revealed left tibial motor amplitude loss. (Tr. 342-343.)

Stubbs returned to Dr. Mars on December 12, 2013. (Tr. 334-335.) She reported that "overall she was stable until 11/25/12 when she was involved in a motor vehicle accident."[3] (*Id*.) Stubbs indicated she subsequently developed lower back pain radiating to her hips and legs, as well as a continuous, burning sensation in her knees. (*Id*.) She also complained of cervical pain radiating to her shoulders and arms, with associated paresthesias and weakness. (*Id*.) Stubbs reported she had received chiropractic treatment and been treated with Motrin, Vicodin, Percocet, and Neurontin. (*Id*.) On examination, Dr. Mars found Stubbs' musculoskeletal strength, gait, sensation, reflexes, and cognition were all normal. (*Id*.) He did, however, note that she was "very tight and tender in the cervical and lumbosacral paraspinous areas." (*Id*.) Dr. Mars diagnosed cervical and lumbosacral myofascitis and possible radiculopathy; and ordered MRIs of her cervical and lumbar spines and an EMG of her upper and lower extremities. (*Id*.)

Stubbs underwent the MRIs on December 18, 2013. (Tr. 336-339.) The MRI of her cervical spine showed (1) a 1-2 mm central disc herniation at C3-4 with effacement of the ventral subarachnoid CSF space without cord impingement; (2) a 2 mm central disc herniation at

---

[3] In later treatment records, this accident is described in more detail as follows: "[Stubbs] was a restraint passenger in front seat on 11/25/12, car collided with another car, airbags deployed, lost control of car, rolled over a few times. Not sure of speed, but was on a two lane road when it happened. They ended up at the Stephanie Tubbs RTA bus station. She was able to get out of the vehicle when the fire fighters arrived. She was able to walk at that time. She was taken to the ER, she was having a lot of lower back pain then, had a workup. X-rays revealed no fractures, was ruled to have contusions. Was given ibuprofen, does not help. Returned to the ER on 12/4/12 for persistent headaches, had scans, which were unrevealing." (Tr. 295.)

C4-5 with minimal impingement on the ventral aspect of the cervical cord and narrowing of the right neural foramen; (3) a 4 mm central disc herniation at C5-6 with impingement on the ventral aspect of the cervical cord and narrowing of the neural foramina bilaterally; and (4) a 2-3 mm central disc herniation at C6-7 with effacement of the ventral subarachnoid CSF space, minimal impingement on the ventral aspect of the central cord, and narrowing of the left neural foramen. (Tr. 336-337.)

The MRI of her lumbar spine showed (1) a 1-2 mm central disc herniation at L1-L2 with no foraminal compromise; (2) a 2mm central disc herniation at L3-L4 with normal foramen; and (3) minimal anterolisthesis of L4 over L5 with minimal disc bulging, narrowing of the neural foramina bilaterally due to paracentral disc encroachment and hypertrophic changes of the articular facets. (Tr. 338-339.)

On January 10, 2014, Stubbs returned to Dr. Mars. (Tr. 340-341.) Dr. Mars noted the results of Stubbs' imaging, as well as the results of her EMG which he stated showed "some minimal latency changes." (*Id.*) Physical examination findings were normal, although Dr. Mars found tightness in Stubbs' paraspinous musculature. (*Id.*) He prescribed Motrin 800 mg. (*Id.*)

On April 29, 2014, Stubbs presented to the ER with complaints of diffuse abdominal pain for the previous two days. (Tr. 252-255.) She rated her pain a 9 on a scale of 10, and described it as sharp, constant, and associated with nausea. (Tr. 253.) A CT of Stubbs' abdomen and pelvis showed (1) diverticulosis with no definite evidence of acute diverticulitis; (2) a subcentimeter hypodense lesion within the posterior medial right hepatic lobe too small to characterize; and (3) degenerative disc disease and facet arthrosis in the inferior lumbosacral

region.  (Tr. 258-259.)  Stubbs was treated with Toradol and discharged in improved condition.  (Tr. 253-254.)

On July 30, 2014, Stubbs presented to primary care physician Judith Weiss, M.D., with complaints of left ankle pain.  (Tr. 310-313.)  She reported experiencing a left ankle injury eight years previously, and indicated she had been referred to orthopedics in 2012 but never went.  (Tr. 311.)  On examination, Dr. Weiss noted normal range of motion in Stubbs' back, normal extremities, no edema except for left lateral ankle swelling, normal spinal range of motion, and intact muscular strength.  (Tr. 312-313.)  She diagnosed left ankle pain, ordered an x-ray of Stubbs' ankle, and referred her to orthopedics.  (Tr. 313.)

On October 15, 2014, Stubbs presented to Maria Cordula Jain, M.D., at Express Care with complaints of ankle swelling and lower back pain.  (Tr. 307-309.)  On examination, Dr. Jain noted 2+ peripheral edema symmetric, and normal pulses.  (Tr. 308.)  She prescribed Neurontin, and advised Stubbs to elevate her legs and follow up with her primary care physician.  (*Id.*)

Stubbs returned to Dr. Weiss on October 23, 2014.  (Tr. 303-306.)  She complained of worsening "total body pain," particularly in her back, neck, knees, ankles, and right shoulder.  (Tr. 303-304.)  On examination, Stubbs was in moderate distress.  (Tr. 305.)  Dr. Weiss noted diminished, "not normal" range of motion in Stubbs' back and spine, normal extremities, no edema, and intact muscular strength.  (Tr. 305.)  She assessed cervicalgia, lumbago, and lung nodule; ordered an x-ray of Stubbs' neck and a CT of her chest; and referred her to Neurology and Physical Medicine & Rehabilitation ("PM&R").  (Tr. 306.)  In addition, Dr. Weiss noted as follows:

> This patient will need aggressive range of motion and strengthening.  I told her that with aggressive treatment she will likely need two years of [physical therapy].  She

6

is quite stiff and cannot find a comfortable position. Sleeps on the right side but frequently awakens due to pain. I am asking her to follow up with me monthly until she improves.

(Tr. 306.) On that same date, Stubbs underwent an x-ray of her neck. (Tr. 325.) This imaging revealed: "Straightening of the cervical lordosis and general and slight retrolisthesis of C5 on C6 in particular. Degenerative spurring is seen at this level and also at C6-7." (*Id.*)

Several days later, on October 28, 2014, Stubbs presented to Michelle Geraci-Rambasek, M.D., at Express Care with complaints of left lower calf pain and chronic swelling of her bilateral lower legs. (Tr. 301-302.) Examination revealed tenderness to palpation in Stubbs' left lower extremity with some enlarged varicose veins, normal knee range of motion, and some swelling around the patella. (*Id.*) Dr. Geraci-Rambasek assessed left lower leg pain of "unclear etiology," which she thought could be a possible muscle strain or early thrombophlebitis. (*Id.*) She ordered a duplex ultrasound to rule out possible deep vein thrombosis, and advised Stubbs to use cool compresses, elevate her legs, and take Naprosyn for pain. (*Id.*)

On October 29, 2014, Stubbs underwent a CT of her chest, which revealed a "stable 4 mm nodule in the left upper lobe" which was "now considered benign." (Tr. 321-322.) On that same date, she underwent an ultrasound of her left leg, which showed "no evidence for an acute deep venous thrombosis within the left lower extremity from the groin to the knee." (Tr. 319.)

On November 6, 2014, Stubbs presented to Preeti Gandhi, M.D., with complaints of neck and lower back pain. (Tr. 293-300.) She rated her pain an 8 on a scale of 10, and stated it had been present for the past two years as a result of the 2012 motor vehicle accident. (Tr. 294.) Stubbs indicated she had seen "PM&R" (i.e., Physical Medicine & Rehabilitation), participated in physical therapy, and taken Gabapentin, Naprosyn, and Lidocaine patches but "none of these

7

help much." (Tr. 295.) She reported her pain worsened with forward flexion, prolonged activity, and cold temperatures. (Tr. 294.) Stubbs indicated her "duration for standing is 5 minutes, sitting is 5 minutes, and walking is 5 minutes." (*Id*.) She also reported fatigue and sleep disturbance. (*Id*.)

Dr. Gandhi noted Stubbs' "description of symptoms is very vague– says pain sometimes goes down the legs in a non-dermatomal pattern." (Tr. 295.) On examination, Dr. Gandhi noted mildly to severely painful range of motion on flexion, extension, and rotation; tenderness to palpation; normal sensation; normal motor strength in Stubbs' bilateral upper and lower extremities; and normal fine motor coordination. (Tr. 296.) Dr. Gandhi's treatment note is internally contradictory with regard to her other findings. Specifically, Dr. Gandhi noted normal 2+ reflexes at one point but then found only trace reflexes in Stubbs' ankles and 1+ reflexes in her triceps, biceps, and brachioradialis. (*Id*.) Additionally, Dr. Gandhi initially described Stubbs' gait as normal, but later stated it was slow. (*Id*.)

Dr. Gandhi found Stubbs' "description of symptoms is consistent with lumbar spondylosis with possible element of [degenerative disc disease]/radiculitis (although only occasional radiation of pain to her leg, in a non-dermatomal pattern)." (Tr. 299.) She recommended pool therapy and weight control, and increased her Gabapentin dosage. (*Id*.) Dr. Gandhi also ordered "lumbar MBBs;" which appears to be a reference to lumbar medial branch blocks. (*Id*.)

On November 11, 2014, Stubbs presented to neurologist Hari Prasad Kunhi Veedu, M.D., for evaluation of her chronic neck and back pain. (Tr. 289-292.) She reported she had quit her job as a home health aide because of muscle spasms and an inability to lift patients. (Tr. 290.)

Stubbs reported neck spasms and stiffness, as well as chronic back pain shooting to her right leg "at times." (*Id.*) Physical examination findings were normal, including normal motor strength, tone, and bulk; normal sensation; normal reflexes, and normal gait. (Tr. 292.) Dr. Veedu ordered an MRI of her lumbar spine and prescribed lidoderm patches. (*Id.*)

On November 19, 2014, Stubbs presented to Dr. Weiss. (Tr. 286-288.) Dr. Weiss advised her "this is going to be a long rehabilitation." (Tr. 287.) On examination, she noted "sluggish but symmetrical" reflexes and 4/5 strength in Stubbs' right hip. (Tr. 288.) Dr. Weiss assessed osteoarthritis, and referred her to a pain management program. (*Id.*)

Stubbs returned to Dr. Weiss on December 9, 2014. (Tr. 284-285.) She reported she "has gotten better with chiropractic and physical therapy," and rated her pain a 3 on a scale of 10. (*Id.*) Stubbs indicated she was "now working at UPS doing transport of equipment and supplies" and was "able to get up and down from truck and carry packages." (*Id.*) She complained of neck stiffness and occasional tingling in her hands. (*Id.*) Physical examination findings were normal. (*Id.*)

On January 16, 2015, Stubbs presented to Xiaozhou Tang, M.D., at Express Care with complaints of worsening muscle spasms and back pain. (Tr. 281-283.) She also reported tingling in her fingers. (Tr. 282.) On examination, Dr. Tang noted mild tenderness in Stubbs' lumbar area. (Tr. 283.) She referred Stubbs to Physical Medicine & Rehabilitation. (*Id.*)

On January 19, 2015, Dr. Mars wrote a letter in response to a request for information from one of Stubbs' attorneys. (Tr. 344-346.) After recounting Stubbs' treatment history, Dr. Mars stated as follows:

> In summary, Mrs. Stubbs is a 50 year old woman with antecedent leg pain from an
> accident on 5/12/11, but became involved in a second accident on 11/25/12 with

development of cervical and lumbosacral myofascitis, multi-level disc herniations in the cervical and lumbar spine, maximum at C5/6 with narrowing of the spinal canal at that level to 7 mm.

It is my opinion with a reasonable degree of medical certainty that these conditions are causally associated with the motor vehicle accident of 11/25/12. My prognosis for Mrs. Stubbs is guarded. When last seen, in excess of 1 year from the time of that accident, she was still symptomatic. Her symptoms have therefore become chronic. It is my opinion, given with a greater than 51% certainty, that she will continue to experience variable discomfort permanently.

(Tr. 345-346.)[4]

### *Post-Onset Date*

On April 14, 2015, Dr. Mars authored another letter to Stubbs' attorney. (Tr. 349.) In this letter, he stated as follows:

Mrs. Stubbs was seen in follow up 4/8/15. She reported that over the past year she has experienced persistent [pain] in her neck, back and knees and has felt that her memory has gotten progressively poor. She has not had any benefit from Neurontin. An electromyogram did not demonstrate any radicular changes. Clinically she demonstrated tightness and tenderness in the cervical and lumbosacral paraspinous area.

It is my opinion, given with a greater than 51 % certainty, that Mrs. Stubbs has cervical and lumbosacral myofascitis, multiple disc herniations in the cervical and lumbar spine, and these conditions are causally associated with the motor vehicle accident of 11/25/12.

My prognosis for Mrs. Stubbs, again rendered with a greater than 51 % certainty, is that her symptoms have now become chronic, and that she will experience variable symptomatology indefinitely.

(*Id.*)

---

[4] The Court notes the record contains another letter from Dr. Mars, also dated January 19, 2015, which is different from the above. In this letter, Dr. Mars again recounts Stubbs' treatment history but concludes "[a]s I have not seen her for a sufficient period of time subsequent to [the 11/25/12] accident, I have no opinion regarding chronicity." (Tr. 347-48.) Neither party addresses the significance, if any, of these differing versions of Dr. Mars' January 19, 2015 letter.

On June 25, 2015, Stubbs returned to Dr. Tang with complaints of worsening back pain, "after she was running with loose shoes chasing someone." (Tr. 416-418.) Stubbs indicated she was "requesting today and tomorrow off work because of the back pain." (Tr. 416.) On examination, Dr. Tang noted limited range of motion and mild tenderness in Stubbs' back. (Tr. 417.) She administered a Toradol injection and prescribed Flexeril. (*Id.*)

Stubbs returned to Dr. Weiss on June 30, 2015. (Tr. 413-415.) Dr. Weiss noted as follows:

> Patient went back to work at her insistence in catering. And was not able to keep up with her production requirements due to the back pain. She lost her job; never followed up with physical therapy or physical medicine. Presented me with papers for disability. I told her that now she REALLY has to see physical medicine.

(Tr. 414.) On examination, Stubbs was in mild distress and exhibited difficulty with waist flexion. (*Id.*) Physical examination findings were otherwise normal, including normal range of motion in Stubbs' back, normal reflexes, and normal strength. (*Id.*) Dr. Weiss referred Stubbs to Physical Medicine, and advised her to take her Flexeril as prescribed. (*Id.*)

On September 29, 2015, Stubbs presented to Dr. Weiss with complaints of pain in her knees, back, wrists, and shoulders. (Tr. 411.) Dr. Weiss noted as follows:

> Multiple joint pains; wrists, knees, shoulders. Injured in a bus accident; went back to work, now she is stating that she insisted on returning too soon. Unable to perform her duties as a server of food. * * *
>
> Has not [followed up] with [physical therapy] or [Physical Medicine & Rehabilitation]; referred 7 times in the past year. States she is busy. States she wants to just get on disability so she can stay home and not have to work. I told her that it is unlikely that it will be approved given that she has not cooperated with attempting to repair/restore/rehabilitate her back. Patient angry that I told her the truth.

11

(*Id.*)  On examination, Dr. Weiss found normal range of motion in Stubbs' back and sluggish (1/4) reflexes bilaterally.  (Tr. 412.)  She indicated that Stubbs refused to attempt range of motion testing in her hips, quadriceps, or hamstrings.  (*Id.*)  Dr. Weiss again referred Stubbs to Physical Medicine & Rehabilitation.  (*Id.*)

On November 1, 2015, Stubbs presented to the ER with complaints of right shoulder pain for the previous two weeks, radiating to her neck.  (Tr. 432-447.)  Examination revealed mild right trapezius muscle spasm and tenderness and right posterior rotator cuff tenderness.  (Tr. 437.)  Stubbs underwent an x-ray of her right shoulder which revealed degenerative change of the right AC joint with periarticular osteophytosis and bony reactive changes of the greater tuberosity, "which can be seen in association with rotator cuff tendonopathy/tear."  (Tr. 441.)  Stubbs was diagnosed with right rotator cuff tendinitis, and provided a shoulder immobilizer.  (Tr. 438.)

On November 9, 2015, Stubbs presented to Physical Medicine & Rehabilitation physician Antwon Morton, D.O.  (Tr. 493-498.)  She complained of neck, back, and right shoulder pain, which she rated an 8 on a scale of 10.  (*Id.*)  Stubbs described her neck and back symptoms as follows:

> Back: [Motor vehicle accident] 3 years ago; bothering her ever since, mid lower back. Muscle spasms, difficulty getting on exam table or getting up off floor. Wakes up stiff. Nerve pain in legs - burning sensation, sometimes helped by massage or tapping foot. This is mostly on the sides and tops of feet, but occasionally diffuse. Hurts with walking. Takes ibuprofen about twice a day. Helps her relax. Formerly on Vicodin for R shoulder tendonitis, did not help so has not requested it again. Was on gabapentin, made her off- balance so stopped taking it. Prescribed Zanaflex, not taking it. Did not help and made her sleepy.
>
> * * *

Neck: Had bulging disc in neck after [motor vehicle accident], now has a lot of popping in her neck since her shoulder pains started, hurts. Only on the right. Strains, uncomfortable. Was hurting in mid upper arm, never in forearm or fingers.

(Tr. 494.)  She also reported memory loss since her motor vehicle accident.  (*Id*.)

On examination, Dr. Morton noted cervical tenderness and slightly diminished range of motion with no evidence of spasms or trigger points; shoulder tenderness with normal range of motion; normal pulses and sensation; increased lumbar lordotic curvature; lumbar tenderness to palpation with no evidence of spasm or trigger points; decreased lumbar range of motion; negative straight leg raise; pain with FABER and facet loading testing; and reduced (4/5) strength in her shoulders, elbows, and hips.  (Tr. 496-497.)  He assessed lower back pain secondary to spondylosis with associated muscle tightness and right shoulder pain likely due to AC joint arthropathy and possibly bicepital tendinosis.  (Tr. 497.)  Dr. Morton referred Stubbs to physical therapy and advised her to continue taking Ibuprofen.  (*Id*.)

On December 24, 2015, Stubbs presented for her first session of physical therapy.  (Tr. 489-492.)  On this date, Stubbs' therapy session was limited to her shoulder condition only, with later sessions to address her lower back pain.  (Tr. 489.)  Stubbs reported her shoulder pain was generally between a 0 and 5 on a scale of 10, and exacerbated by lifting, reaching, dressing, and housework.  (Tr. 490.)  Examination revealed tenderness to palpation in Stubbs' cervical spine and right shoulder region; diminished range of motion in her cervical spine on extension and rotation; and reduced (4/5) strength in her bilateral biceps, triceps, and wrists.  (Tr. 491.)  Her therapist, Charles Duber, P.T., found Stubbs had the following impairments: "Pain, Decreased Range of Motion (shoulders/neck), decreased strength (shoulders/scapular weakness), Decreased Flexibility (UT, Levator, pectorals), Decreased Function, Postural

Deviation, Lack of Home Exercise Program, and Poor body mechanics." (Tr. 492.) Mr. Duber indicated Stubbs' prognosis for therapy was good. (*Id.*)

The record reflects Stubbs thereafter presented for physical therapy sessions for her right shoulder on January 8, 15, 22, and 29, 2016 and February 2 and 5, 2016. (Tr. 463-481.) During these visits, Stubbs reported some improvement in her shoulder pain but continued to complain of neck pain and "clicking/popping." (Tr. 480, 477, 474, 471-472, 468, 464.) Stubbs rated her pain a 5 on a scale of 10 during these sessions. (*Id.*)

Meanwhile, on January 6, 2016, Stubbs established care with certified nurse practitioner Melissa Seidowski, CNP. (Tr. 482-488.) She complained of insomnia and "gasping for air in the middle of the night for about 1 year or possibly longer." (Tr. 484.) Physical examination findings were normal, including normal breath sounds, normal range of motion in Stubbs' neck, no edema, no back or neck tenderness, normal motor and sensory function, and no focal deficits. (Tr. 485.) Nurse Seidowski assessed obesity and insomnia, and referred Stubbs for a sleep study. (Tr. 485-486.) Stubbs subsequently underwent the sleep study, which revealed moderate to severe obstructive sleep apnea. (Tr. 452-455.)

On February 23, 2016, Stubbs returned to physical therapy to address her lower back and hip pain. (Tr. 459-462. ) She rated her pain a six on a scale of 10, and indicated it worsened with prolonged sitting, standing, and walking, as well as with lifting, bending, and ascending/descending stairs. (Tr 460.) On examination, the therapist noted increased lumbar lordosis, reduced (3 to 4 on a scale of 5) muscle strength, diffuse tenderness to palpation throughout Stubbs' lower back, negative straight leg raise, positive Patricks/Faber bilaterally; and an independent gait. (Tr. 461.) The therapist found the following impairments: "Pain,

Decreased Range of Motion (hip), Decreased Strength (hip/core weakness), Decreased Flexibility (quads, hip flexors, pinformis), Postural Deviation, Decreased Gait Status, Lack of Home Exercise Program, and Poor body mechanics." (Tr. 462.)

Stubbs returned to Nurse Seidowski on March 8, 2016. (Tr. 456-458.) She reported exercising 2 to 3 times per week, and cutting down on fast and fried foods. (*Id.*) Stubbs complained of right shoulder pain and low back pain with sciatica. (*Id.*) She indicated the pain was slowly improving with physical therapy and she was gaining increased range of motion. (*Id.*) Physical examination findings were normal. (Tr. 458.)

On March 28, 2016, Stubbs presented to Lisa Lanzara, CNP, at Express Care with complaints of right hip pain that began the previous month. (Tr. 448-451.) She rated her pain a 6 on a scale of 10, and reported the pain was a 7 on a scale of 10 when exercising. (Tr. 449.) On examination, Nurse Lanzara noted normal breath sounds with no wheezes or rales, normal range of motion in Stubbs' neck, and pain on palpation to her right hip with full range of motion and no edema. (Tr. 449.) She ordered an x-ray of Stubbs' right hip, which revealed as follows:

> * * * No acute fracture or dislocation. The right hip joint space is well maintained with no significant arthritic change. Spurring is seen off the greater trochanter. There are sclerotic changes involving the inferior right sacroiliac joint, primarily on its iliac aspect. This most likely reflects osteitis condensans ilia.

(Tr. 499.) Nurse Lanzara recommended motrin, rest, ice, and heat, and advised Stubbs to follow up with her primary care physician. (Tr. 451.)

Stubbs returned to PM&R physician Dr. Morton on May 25, 2016. (Tr. 592-597.) She complained of diffuse body pain, most notably in her neck, right shoulder, and low back. (*Id.*) She rated her pain a 9 on a scale of 10, and described it as constant. (*Id.*) Examination of Stubbs' neck reveled normal lordotic curvature, normal range of motion, negative Spurling's

maneuver, and diffuse tenderness. (Tr. 596.) Examination of her right shoulder revealed tenderness to palpation, full range of motion, intact sensation, and positive Hawkin-Kennedy, Neers, Empty can, and Scarfs. (*Id.*) Other examination findings included normal pulses; normal breathing; normal sensation; reduced strength in Stubbs' right shoulder, right elbow, and hip; and decreased stride length but otherwise normal gait. (*Id.*) Dr. Morton concluded Stubbs "likely has fibromyalgia along with rotator cuff tendinopathy and right trochanteric bursitis." (*Id.*) He ordered blood work to rule out other disorders, and administered injections in Stubbs' right hip and shoulder. (*Id.*)

Several days later, on May 29, 2016, Stubbs presented to the ER with complaints of pain in her neck, back, and abdomen, and difficulty breathing. (Tr. 531-548.) She rated her pain a 10 on a scale of 10. (Tr. 535.) Examination revealed normal breathing sounds, decreased range of motion and tenderness in her cervical spine, and tenderness and pain in her thoracic spine. (Tr. 537.) A CT of her cervical spine taken that date showed moderate degenerative changes throughout her spine. (Tr. 540.) She was prescribed pain medication and discharged home. (Tr. 538.)

Stubbs returned to Nurse Seidowski on June 8, 2016. (Tr. 579-591.) Examination findings were normal with the exception of tenderness to palpation in Stubbs' cervical spinal muscles. (Tr. 585-586.) Nurse Seidowski referred Stubbs to neurology and reminded her to see a sleep doctor in light of her positive sleep study. (*Id.*)

On August 9, 2016, Stubbs presented to the ER with a knee injury sustained while she was trying to catch the bus. (Tr. 504-518.) She stated she was unable to walk, described her pain as sharp and severe, and rated it a 10 on a scale of 10. (Tr. 507.) Examination revealed

diffuse swelling and bony tenderness in Stubbs' left knee. (Tr. 508.) An x-ray taken that date was normal. (Tr. 512.) Stubbs was placed in a knee immobilizer, given crutches, and discharged home with instructions to follow up with orthopedics. (Tr. 509.)

On September 1, 2016, Stubbs returned to Dr. Morton. (Tr. 549-553.) She complained of diffuse body pain, but her primary complaint was her left knee pain and swelling. (Tr. 550.) Stubbs indicated the pain was "slowly resolving but she uses crutches to ambulate" and limps secondary to pain. (*Id*.) Examination revealed tenderness in Stubbs' left knee, normal pulses, normal sensation, reduced strength in her right shoulder, right elbow, and hip; and antalgic gait with decreased stride length. (Tr. 553.) Dr. Morton planned to wean Stubbs off her crutches as the pain resolved, and recommended over the counter pain gel. (*Id*.)

## C.      State Agency Reports

On July 9, 2015, state agency physician Lynne Torello, M.D., reviewed Stubbs' medical records and completed a Physical Residual Functional Capacity ("RFC") Assessment. (Tr. 77-79.) Dr. Torello found Stubbs could lift and carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk about 6 hours in an 8 hour workday; and sit for about 6 hours in an 8 hour workday. (*Id*.) She further concluded Stubbs had an unlimited capacity to push and/or pull and balance. (*Id*.) Stubbs could frequently stoop, kneel, crouch, crawl, and climb ramps and stairs, but never climb ladders, ropes or scaffolds. (*Id*.) Finally, Dr. Torello found Stubbs should avoid all exposure to hazardous machinery and unprotected heights. (*Id*.)

On August 31, 2015, state agency physician Abraham Mikalov, M.D., reviewed Stubbs' medical records and completed a Physical RFC Assessment. (Tr. 98-100.) Dr. Mikalov reached the same conclusions as Dr. Torello. (*Id*.)

## D.    Hearing Testimony

During the October 19, 2016 hearing, Stubbs testified to the following:

- She graduated from high school and has an associate's degree as a culinary chef. (Tr. 34-35.) She has previous work as a line cook, pantry cook, home health aide, mail sorter, restaurant server, factory worker, machine operator, and deli clerk. (Tr. 34-46.) For most of her jobs, she was on her feet most of the day. (*Id*.) Some of her jobs involved lifting 50 or more pounds, including her jobs as a line cook, home health aide, mail sorter, and machine operator. (*Id*.) She has not worked since March 2015. (Tr. 34-35.)

- She lives in an apartment with her brother and her thirteen year old son. (Tr. 30, 34.) Her brother is deaf and speech impaired. (Tr. 30.) She testified: "I'm his caretaker, so I take care of basically all of his needs, his meds, and all his doctor appointments because he, like, see[s], like, three different doctors." (Tr. 31.) She indicated her brother is mobile, can dress and bathe himself, and can make his own food. (Tr. 32, 62.) He cannot do the laundry, clean, or buy his own groceries. (*Id*.) She does the cleaning, but can only clean for 15 minutes at one time and then needs to stop. (Tr. 32, 62.) Her son does the laundry, as she cannot do it because of her back problems. (Tr. 62.) She does the grocery shopping. (Tr. 33.) She is hiring a caretaker for her brother because "it's getting too much for me now." (Tr. 31.)

- She had an accident in 2009, after which she began experiencing pain and swelling in her knees. (Tr. 56.) She injured her back in a motor vehicle accident in 2012. (Tr. 58.) In August 2016, she injured her knees while walking to the bus stop. (Tr. 33-34.) Since her August 2016 injury, she has needed to use crutches. (Tr. 58.) She was using crutches at the hearing. (Tr. 28.)

- Her knees are inflamed "all the time." (Tr. 55-56.) The swelling began in 2009 and "nobody can tell me why." (*Id*.) She also experiences swelling in her ankles. (*Id*.) She has lower back pain, which her doctors have described as a permanent injury. (Tr. 57.) She experiences spasms in her upper back. (*Id*.) She has attended ten sessions of physical therapy since 2014. (Tr. 54.) She was prescribed narcotic pain medication but does not take it because she does not want to become dependent on it. (*Id.*) She has not had any injections in her back. (Tr. 55.)

- She has a nodule on her lung and suffers from sleep apnea. (Tr. 53, 59.) She gasps for air when she lays on her back to sleep. (Tr. 59-60.) She does not otherwise suffer from shortness of breath. (*Id*.) She will be getting a CPAP machine soon. (Tr. 59.)

18

- She suffered from shoulder pain during the relevant period. (Tr. 56-57.) Her shoulder pain has resolved since she got a cortisone shot a "couple months ago." (*Id.*) She also got a cortisone shop in her hip. (*Id.*)

- She cannot work because she cannot perform her job duties due to her back and knee pain. (Tr. 47–52.) She lost her most recent job because she was not "pulling her weight." (Tr. 48.) She could not keep up with the pace of the job, and could not do the necessary lifting. (*Id.*) It was also difficult for her to bend and reach. (Tr. 48-51.) She could not tolerate working inside the cooler/freezer due to the cold temperatures. (*Id.*)

- She would not be able to stand for 6 hours due to her knee and back pain. (Tr. 58.) She estimated she could walk or stand for 15- 20 minutes. (Tr. 61.) She has difficulty sitting because of her knee inflammation. (*Id.*)

The VE testified Stubbs had past work as a cook (medium performed as heavy, unskilled, SVP 2); short order cook (light, semiskilled, SVP 3); mail handler (heavy, semiskilled, SVP 3); machine operator/production worker (medium, semiskilled, SVP 3); packager (medium performed as light, unskilled, SVP 2); deli clerk (medium performed as light, unskilled, SVP 2); home health aide (medium, semiskilled, SVP 2). (Tr. 64-65.) The ALJ then posed the following hypothetical question:

> [A]ssume a hypothetical individual of the claimant's age and education and with the past jobs that you described. Further assume that this individual is limited as follows: This is a light exertional hypothetical with the following additional limitations: this individual can occasionally operate foot controls bilaterally. This person can occasionally push and pull with the left lower extremity. This person can occasionally climb ramps and stairs, never ladders ropes or scaffolds, can frequently balance and occasionally stoop, kneel, crouch, and crawl. This person can never be exposed to unprotected heights or moving mechanical parts and can only tolerate occasional exposure to extreme cold. Can this hypothetical individual perform any of the past jobs that Ms. Stubbs performed?

(Tr. 65-66.)

The VE testified the hypothetical individual would be able to perform Stubbs' past work as a short order cook (light, semiskilled, SVP3) and "maybe the packager job," (medium

performed as light, unskilled, SVP 2).  (Tr. 67-68.)  The VE further explained the hypothetical individual would also be able to perform other representative jobs in the economy, such as wire worker (light, unskilled); electronics worker (light, unskilled); and assembly press operator (light, unskilled).  (Tr. 68-69.)

The ALJ then asked a second hypothetical that was the same as the first but at the sedentary exertional level.  (Tr. 68.)  The VE testified that the hypothetical individual would not be able to perform any of Stubbs' past work and "she would have no skills that would transfer to other sedentary work either."  (*Id.*)

Stubbs' counsel then asked the VE "if I were to limit the hypothetical person to standing and walking only four hours a day, would they be able to do any of the light jobs you cited or any light jobs?" (Tr. 69.)  The VE testified: "Not really.  There are some jobs that would allow for that that might be, you know, under the same job description. But I would describe those as sedentary jobs."  (*Id.*)

Stubbs' counsel then asked the VE to assume the first hypothetical with the additional limitation that the individual was limited to occasional reaching with the non-dominant hand.  (Tr. 70.)  The VE testified "that wouldn't have any affect on the jobs that I've mentioned here earlier."  (*Id.*)

## III.  STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to

last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).

A claimant is entitled to a POD only if: (1) she had a disability; (2) she was insured when she became disabled; and (3) she filed while she was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

A disabled claimant may also be entitled to receive SSI benefits. 20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981). To receive SSI benefits, a claimant must meet certain income and resource limitations. 20 C.F.R. §§ 416.1100 and 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4). *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. §§ 404.1520(b) *and* 416.920(b). Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c) *and* 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) *and* 416.920(d). Fourth, if

the claimant's impairment or combination of impairments does not prevent her from doing her past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

Here, Stubbs was insured on her alleged disability onset date, March 2, 2015, and remained insured through September 30, 2018, her date last insured ("DLI.") (Tr. 12.) Therefore, in order to be entitled to POD and DIB, Stubbs must establish a continuous twelve month period of disability commencing between these dates. Any discontinuity in the twelve month period precludes an entitlement to benefits. *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

## IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.  The claimant meets the insured status requirements of the Social Security Act through September 30, 2018.

2.  The claimant has not engaged in substantial gainful activity since March 2, 2015, the alleged onset date (20 CFR 404.1571 et seq., and 416.971 et seq.).

3.  The claimant has the following severe impairments: spine disorders, skin cancer, and osteoarthritis (OA) (20 CFR 404.1520(c) and 416.920(c)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926).

5.  After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except she could occasionally push and pull with both lower extremities and occasionally operate foot controls,

bilaterally. She can occasionally climb ramps/stairs, and stoop, crouch, kneel, or crawl. She can never climb ladders/ropes/scaffolds, and she is precluded from exposure to unprotected heights or moving mechanical parts. She can frequently balance, and can occasionally be exposed to extreme cold.

6. The claimant is capable of performing past relevant work as a short order cook and as a machine operator/production worker. These jobs did not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965.)

7. The claimant has not been under a disability, as defined in the Social Security Act, from March 2, 2015, through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

(Tr. 12-19.)

## V.  STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec*., 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.") This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.,White v. Comm'r of Soc. Sec*., 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec*., 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305,

307 (7th Cir.1996); accord *Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If

relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely

overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v.

Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562

(N.D. Ohio July 9, 2010).

## VI.  ANALYSIS

### *Evaluation of the Medical Evidence*

In her first assignment of error, Stubbs argues the ALJ failed to properly evaluate the

medical evidence.  (Doc. No. 15 at 11-16.)  She maintains "the only medical evidence cited by

the ALJ was an office note from Dr. Weiss dated September 29, 2015," and "no mention was

made regarding any of the additional medical evidence in this matter."  (*Id*. at 14.)  Specifically,

Stubbs asserts the ALJ failed to mention or address the medical evidence relating to her back,

breathing, or knee impairments.  (*Id*.)  She maintains the ALJ cherry-picked the evidence by

failing to address "evidence which would not have supported his RFC finding that Stubbs could

perform work at the light exertional level." (*Id*. at 15.)

The Commissioner argues the ALJ properly evaluated the medical evidence in

assessing Stubbs' RFC.  (Doc. No. 16 at 7-10.)  She notes the ALJ gave "great weight" to the

opinions of the state agency physicians (Drs. Torello and Mikalov), both of whom had an

opportunity to review the medical record.  (*Id*. at 8.)  The Commissioner notes the ALJ, in fact,

included more restrictive limitations than that proposed by the state agency physicians

(including occasional postural limitations and a restriction against working in extreme cold) in

order to account for Stubbs' subjective complaints.  (*Id*.)  She asserts that, read as a whole, the

ALJ decision fully addresses the medical evidence regarding Stubbs' various impairments at other steps in the sequential evaluation. (*Id*. at 8-9.) Specifically, the Commissioner notes the ALJ discussed the medical evidence regarding Stubbs' knee and breathing impairments at step two, and evaluated the evidence regarding her back impairments at step three. (*Id.*) Finally, the Commissioner argues "to the extent that Plaintiff argues that the ALJ did not describe every piece of evidence or every treatment note, she has not identified any error because the ALJ is not required to discuss every piece of evidence." (*Id*. at 10.) Rather, she maintains "the ALJ considered the evidence as a whole, acknowledged Plaintiff's underlying complaints, and reached a reasoned conclusion." (*Id.*)

In her Reply Brief, Stubbs argues the ALJ's reliance on the state agency physician opinions is misplaced because those physicians "did not review any evidence submitted after" their July and August 2015 decisions. (Doc. No. 17 at 2.) Stubbs further argues the evidence cited in the Commissioner's brief in support of the RFC constitutes "*post hoc* rationalizations to justify the ALJ's failure to properly evaluate the medical evidence in this matter." (*Id.*)

The RFC determination sets out an individual's work-related abilities despite his or her limitations. *See* 20 C.F.R. § 416.945(a). A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner. *See* 20 C.F.R.§ 416.927(d)(2).[5] An ALJ "will not give any special significance to the source of an opinion on issues reserved to the Commissioner." *See* 20 C.F.R.§ 416.927(d)(3). As such, the ALJ bears the responsibility for

---

[5] This regulation has been superseded for claims filed on or after March 27, 2017. As Stubbs' applications were filed in April and May 2015, this Court applies the rules and regulations in effect at that time.

assessing a claimant's RFC based on all of the relevant evidence, 20 C.F.R. § 416.946(C), and must consider all of a claimant's medically determinable impairments, both individually and in combination. *See* SSR 96–8p, 1996 WL 374184 (SSA July 2, 1996).

"In rendering his RFC decision, the ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis." *Fleischer*, 774 F.Supp.2d at 880 (citing *Bryan v. Comm'r of Soc. Sec.*, 383 Fed. Appx. 140, 148 (3d Cir. 2010) ("The ALJ has an obligation to 'consider all evidence before him' when he 'mak[es] a residual functional capacity determination,' and must also 'mention or refute [...] contradictory, objective medical evidence' presented to him.")). *See also* SSR 96–8p at *7, 1996 WL 374184 (SSA July 2, 1996) ("The RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted.")). While the RFC is for the ALJ to determine, however, it is well established that the claimant bears the burden of establishing the impairments that determine his RFC. *See Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999).

It is well established there is no requirement that the ALJ discuss each piece of evidence or limitation considered. *See, e.g., Conner v. Comm'r*, 2016 WL 4150919, at *6 (6th Cir. Aug. 5, 2016) (citing *Thacker v. Comm'r*, 99 Fed. Appx. 661, 665 (6th Cir. May 21, 2004) (finding an ALJ need not discuss every piece of evidence in the record); *Arthur v. Colvin,* 2017 WL 784563, at *14 (N.D. Ohio Feb. 28, 2017) (accord). However, courts have not hesitated to remand where an ALJ selectively includes only those portions of the medical evidence that

places a claimant in a capable light, and fails to acknowledge evidence that potentially supports a finding of disability. *See e.g., Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 724 (6th Cir.2014) (reversing where the ALJ "cherry-picked select portions of the record" rather than doing a proper analysis); *Germany–Johnson v. Comm'r of Soc. Sec.*, 313 Fed. App'x 771, 777 (6th Cir. 2008) (finding error where the ALJ was "selective in parsing the various medical reports"). *See also Ackles v. Colvin*, 2015 WL 1757474 at * 6 (S.D. Ohio April 17, 2015) ("The ALJ did not mention this objective evidence and erred by selectively including only the portions of the medical evidence that placed Plaintiff in a capable light."); *Smith v. Comm'r of Soc. Sec.*, 2013 WL 943874 (N.D. Ohio March 11, 2013) ("It is generally recognized that an ALJ "may not cherry-pick facts to support a finding of non-disability while ignoring evidence that points to a disability finding."); *Johnson v. Comm'r of Soc. Sec.*, 2016 WL 7208783 (S.D. Ohio Dec. 13, 2016) ("This Court has not hesitated to remand cases where the ALJ engaged in a very selective review of the record and significantly mischaracterized the treatment notes.").

Here, at step two, the ALJ determined Stubbs suffered from the severe impairments of spine disorders, skin cancer, and osteoarthritis. (Tr. 14.) He determined Stubbs' shoulder, knee, and breathing were non-severe, explaining as follows:

> The claimant also has the following non-severe impairments: obesity, right shoulder pain, bilateral knee pain, and sleep apnea.

> The claimant is obese. She testified she is 65 inches tall and weighs 240 pounds. However, there is no evidence of diabetes mellitus. She has sleep apnea (Ex. 9F), but she testified she is waiting for the arrival of her CPAP apparatus. Further, she testified her right shoulder is no longer painful after she received cortisone injections. She injured her knees in August 2016, and was given crutches (Testimony). An examination of the claimant in September 1, 2016 showed a normal range of motion in her knees. Her left knee xray was normal (Ex. 8F page 9). She was advised to exercise and lose weight. Her physician's intent was to wean her from the crutches (Ex. 9F page 5). However, she appeared at the hearing with crutches. It

is not known if her knee impairments will satisfy the 12 continuous month's durational requirement of the Listings.

(Tr. 14-15.)

At step three, the ALJ found Stubbs' impairments did not meet or equal the requirements of a Listing. (Tr. 15-16.) He considered evidence relevant to Listings 1.02 and 1.04 as follows:

The severity of the claimant's physical impairments, considered singly and in combination, does not meet or medically equal the criteria of any impairment listed in 1.02, 1.04, and 13.03.

An MRI of her cervical spine on December 18, 2013 showed,

"At C3-4, there is a 1-2 min central disc herniation. This is causing effacement of ventral subarachnoid CSF space, without impingement on the cervical cord. The neural or foramina are patent,

At C4-5, there is a 2 mm central disc herniation. Minimal impingement on the ventral aspect of the cervical cord is present. Narrowing of the right neural foramen is present,

At CS-6, there is a 4 mm central disc herniation. Impingement on the ventral aspect of the cervical cord is present. The ventral spinal canal this level measures approximately 7 mm. Narrowing of the neural foramina is present bilaterally,

At C6-7, there is a 2-3 mm central disc herniation. This is effacing the ventral subarachnoid CSF space, and causing minimal impingement on the ventral aspect of the cervical cord. Narrowing of the left neural foramen is present.

At C7-Tl, the dural sac and foramen are widely patent and there is no evidence of cord compression or displacement of the exiting nerve root" (Ex. 3F page 8).

Thus, she had disc disease, but no significant nerve root involvement. Similarly, a CT scan of the cervical spine on May 29, 2016 revealed only,

"Moderate degenerative changes throughout the cervical spine" (Ex. 8F page 37).

An MRI of the lumbar spine on December 18, 2013 revealed,

> "At LI-L2, the posterior longitudinal ligament is elevated by a 1-2 mm central disc herniation. No foraminal compromise,

> At L3-L4, there is a 2 mm central disc herniation. There are normal foramen. The posterior longitudinal ligament is elevated" (Ex. 3F page 10-11).

Again, she had disc disease, but no nerve root involvement. At the hearing, she testified she is on no pain medications. Further, she is neurologically intact and her EMG was negative for a radiculopathy (Ex. 3F page 17). Prior to hurting her knee in August 2016, her gait was normal (Ex. 3F and Ex. 7F).

(Tr. 15-16.)

The ALJ then proceeded to step four. The entirety of the ALJ's analysis at this step is as follows:

> At the hearing, she testified she is unable to work due to pain in her neck, low back, and knees.

> After careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to produce the above alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision. Accordingly, these statements have been found to affect the claimant's ability to work only to the extent they can reasonably be accepted as consistent with the objective medical and other evidence.

> Under SSR 16-3p, I am obliged to evaluate the consistency of the claimant's subjective complaints. I find they are not supported by the evidence or by the testimony. First, she testified she lives with her brother, who is deaf and speech impaired. She testified she is his "caregiver," meaning she shops, cooks, and does household chores for her brother. Next, she testified she is not taking pain medication. Finally, I must note a report from the claimant's primary care physician, Dr. Weiss. On September 29, 2015, Dr. Weiss reported the following:

> > "States she (the claimant) wants to just get on disability so she can stay home and not have to work. I told her that it is unlikely that it will be approved given that she has not cooperated with attempting

to repair/restore/rehabilitate her back. Patient angry that I told her the truth" (Ex. 5F page 1).

I note that the state agency consultant determined the claimant was capable of light work, with no exposure to industrial hazards, and that she was capable of frequent postural movements (Exs. lA, 2A, and 5A). I give great weight to these opinions. However, I have reduced her to occasional postural movements in deference to her subjective complaints. I have also added a limitation on exposure to extreme cold. She testified that was one reason she stopped working (SSR 96-6p).

There are no contrary treating source opinions.

(Tr. 16-17.) The ALJ assessed the following RFC:

After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except she could occasionally push and pull with both lower extremities and occasionally operate foot controls, bilaterally. She can occasionally climb ramps/stairs, and stoop, crouch, kneel, or crawl. She can never climb ladders/ropes/scaffolds, and she is precluded from exposure to unprotected heights or moving mechanical parts. She can frequently balance, and can occasionally be exposed to extreme cold.

(Tr. 16.)

For the following reasons, the Court finds the ALJ failed to meaningfully address the medical evidence regarding Stubbs' neck, back, and knee impairments. Specifically, while the ALJ discussed some of the medical evidence at steps two, three and four, the decision failed to address the majority of Stubbs' treatment records, failed to acknowledge or address the abnormal objective findings documented by her physicians, and misstated the evidence in several respects. As set forth below, the deficiencies in the ALJ's decision are so pervasive and severe as to preclude meaningful appellate review.

First, the Court agrees with Stubbs that the ALJ failed to evaluate the majority of the medical evidence in the record. Even reading the decision as a whole, it is clear the ALJ cited to only a handful of Stubbs' many treatment records and objective test results. Indeed, a review

of the decision reveals the ALJ specifically cited and discussed only three of Stubbs' treatment records: (1) Dr. Morton's September 1, 2016 treatment note indicating he intended to wean Stubbs off her crutches (Tr. 553, cited as Exhibit 9F page 5); (2) Dr. Mars' January 19, 2015 letter indicating Stubbs was neurologically intact and her EMG was negative for radiculopathy (Tr. 344-346, cited as Exhibit 3F page 17); and (3) Dr. Weiss' September 29, 2015 treatment note finding Stubbs had not "cooperated with attempting to repair/restore/rehabilitate her back" (Tr. 411 cited as Exhibit 5F page 1.) (Tr. 15-17.) The ALJ ignored, however, the many other treatment notes in the record, many of which included abnormal physical examination findings as follows:

- Dr. Tang's June 25, 2015 treatment note, finding limited range of motion and mild tenderness in Stubbs' back (Tr. 416-418);

- Dr. Morton's November 9, 2015 treatment note, finding cervical tenderness and diminished range of motion, shoulder tenderness, lumbar tenderness and decreased range of motion, pain with FABER and facet loading testing; and reduced (4/5) strength in her shoulders, elbows, and hips (Tr. 496-497);

- Stubbs' physical therapy records from December 2015 through February 2016, documenting tenderness to palpation in her cervical spine and right shoulder, diminished range of motion in her cervical spine, reduced strength in her bilateral biceps, triceps, and wrists, increased lumbar lordosis, reduced lumbar muscle strength, and positive Patricks/Faber bilaterally (Tr. 459-492);

- Nurse Lanzara's March 28, 2016 treatment note, finding pain to palpation in Stubbs' right hip (Tr. 448-451);

- Dr. Morton's May 25, 2016 treatment note, finding tenderness in Stubbs' right shoulder and cervical spine; reduced strength in her right shoulder, right elbow, and hip; and decreased stride length (Tr. 596); and

- Nurse Seidowski's June 8, 2016 treatment note, finding tenderness to palpation in Stubbs' cervical spinal muscles (Tr. 586).

The ALJ's failure to address these treatment notes is particularly concerning in light of the fact the decision otherwise fails to acknowledge or address any of the abnormal physical examination findings documented in the record. While an ALJ need not discuss every piece of evidence, here it appears the ALJ only mentioned certain treatment records which supported the RFC while failing to acknowledge or evaluate treatment records that did not. As noted above, an ALJ "may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis." *Fleischer*, 774 F. Supp.2d at 880 (citing *Bryan*, 383 Fed. Appx. at 148 ("The ALJ has an obligation to 'consider all evidence before him' when he 'mak[es] a residual functional capacity determination,' and must also 'mention or refute [...] contradictory, objective medical evidence' presented to him.")). *See also Gentry*, 741 F.3d at 724 (reversing where the ALJ "cherry-picked select portions of the record" rather than doing a proper analysis); *Germany–Johnson*, 313 Fed. App'x at 777 (finding error where the ALJ was "selective in parsing the various medical reports"); *Ackles*, 2015 WL 1757474 at * 6 ("The ALJ did not mention this objective evidence and erred by selectively including only the portions of the medical evidence that placed Plaintiff in a capable light.")

The ALJ's error in this regard is compounded by the fact that the decision mischaracterized some of the evidence that was cited. Perhaps most egregious, the ALJ purported to reproduce the results of Stubbs' December 2013 lumbar MRI verbatim but, in fact, a careful review reveals the ALJ omitted that same report's most concerning finding; i.e., that Stubbs had anterolisthesis of L4 over L5 with narrowing of the neural foramina bilaterally due

to paracentral disc encroachment and hypertrophic changes of the articular facets.[6] (Compare Tr. 15-15 with Tr. 338-339.) Additionally, while the ALJ emphasized Dr. Weiss' September 2015 treatment note indicating Stubbs was non-compliant with treatment recommendations that she attend physical therapy and follow up with Physical Medicine & Rehabilitation ("PM&R"), the ALJ failed to acknowledge or address the fact that Stubbs thereafter attended multiple physical therapy sessions for her shoulder and back in late 2015/early 2016 and, further, established a treatment relationship with PM&R physician Dr. Morton and saw him on at least three occasions between November 2015 and September 2016.

The Commissioner nonetheless argues remand is not required because the ALJ accorded "great weight" to state agency physicians Drs. Torello and Mikalov, both of whom reviewed Stubbs' medical records. This argument is without merit. As Stubbs correctly notes, Drs. Torello and Mikalov submitted opinions in July and August 2015 and, therefore, did not have the opportunity to review the many treatment records post-dating their opinions, including Stubbs' physical therapy notes; the treatment records of Dr. Morton, Nurse Seidowski, and

---

[6] The Court also questions the ALJ's characterization of Stubbs' cervical spine MRI. The ALJ recites the results of this imaging and states, conclusorily and without further explanation, that "thus, she had disc disease but no significant nerve root involvement." (Tr. 15.) However, Stubbs' cervical MRI showed multiple disc herniations, one of which (at C5-6) impinged on the ventral aspect of the cord resulting in narrowing of the ventral spinal canal to 7 mm. (Tr. 336-337.) The ALJ does not explain the basis for his apparent conclusion that this MRI result does not show significant degenerative disc disease. It bears noting that ALJs are not trained medical experts and do not have the expertise to make medical judgments. *See, e.g., Schmidt v. Sullivan*, 914 F.2d 117, 118 (7th Cir.1990) ( "But judges, including [ALJs] of the Social Security Administration, must be careful not to succumb to the temptation to play doctor.")); *Winning v. Comm'r of Soc. Sec.*, 661 F.Supp.2d 807, 823–24 (N.D. Ohio 2009) ("Although the ALJ is charged with making credibility determinations, an ALJ 'does not have the expertise to make medical judgments.'").

Nurse Lanzara; and treatment records associated with Stubbs' ER visits in November 2015, May 2016, and August 2016. While "[t]here is no categorical requirement that the non-treating source's opinion be based on a 'complete' or 'more detailed and comprehensive' case record," *Helm v. Comm'r of Soc. Sec.*, 2011 WL 13918 at * 4 (6th Cir. Jan. 4, 2011), the Sixth Circuit does require "some indication that the ALJ at least considered [later treatment records] before giving greater weight to an opinion that is not 'based on a review of a complete case record.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 409 (6th Cir. 2009) (quoting *Fisk v. Astrue*, 253 Fed. Appx. 580, 585 (6th Cir. 2007)). Here, the ALJ failed to consider these later treatment records in any meaningful way, at any point in the decision. Thus, the Court finds the ALJ's reliance on the state agency physicians' opinion is insufficient to cure his failure to meaningfully address the medical evidence regarding Stubbs' neck, back, and knee impairments.

In sum, the ALJ's evaluation and discussion of the medical evidence is so deficient that it precludes meaningful appellate review.[7] As noted *supra*, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer*, 774 F. Supp. 2d at 877 (quoting *Sarchet*, 78 F.3d at 307). *See also Shrader*, 2012 WL 5383120 at * 6 ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked.").

---

[7] The Court is greatly concerned by the ALJ's failure to thoroughly consider and evaluate the medical evidence in the instant case. While the Court understands the pressures ALJs face to timely render decisions on disability applications, there is simply no excuse for the lack of attention and care shown to Stubbs' claims by the ALJ in this matter.

As this matter is being remanded for further proceedings, and in the interests of judicial economy, the Court will not consider Stubbs' remaining assignments of error.

## VII.  CONCLUSION

For the foregoing reasons, the Commissioner's final decision is VACATED and the case REMANDED for further consideration consistent with this decision.

**IT IS SO ORDERED.**

 *s/Jonathan D. Greenberg*
Jonathan D. Greenberg
United States Magistrate Judge

Date: October 22, 2018